**ILLINOIS TOOL WORKS INC.,**

      **Plaintiff,**

**v.**                                     **Case No.: 8:17-cv-420-T-30AAS**

**BG PRODUCTS, INC.,**

      **Defendant.**

_____/

## REPORT AND RECOMMENDATION

Before the undersigned are Plaintiff's Motion for Preliminary Injunction (Doc. 5) and accompanying declarations (Docs. 6, 7, 46, 53), Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (Doc. 50) and accompanying declarations (Docs. 51, 52), and Plaintiff's Reply (Doc. 53).[1]  A hearing was held on the motion.  For the reasons that follow, the undersigned recommends that the Court deny the Motion for Preliminary Injunction.

### I.  Background

On February 21, 2017, Plaintiff filed the instant action, alleging claims for False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a), and common law unfair competition and seeking injunctive relief. (Doc. 1).  The allegations relate to an advertising brochure ("Brochure") distributed by Defendant that compared Plaintiff's and Defendant's products.  Plaintiff contends that at least six statements in Defendant's Brochure contain false and misleading claims regarding the chemistry, performance, and quality of Plaintiff's automotive care products.  In the instant motion for preliminary injunction, Plaintiff seeks the imposition of a

---

[1] The district judge referred this matter to the undersigned for consideration and a Report and Recommendation. (Doc. 49).  *See* Local Rule 6.01(a), M.D. Fla.

preliminary injunction enjoining Defendant from further disseminating the Brochure and the advertising claims contained therein and ordering a recall of all copies of the Brochure or any other advertisements, promotional materials, or communications containing false and misleading claims.

## II.    Findings of Fact

1.    Plaintiff manufactures and sells automotive care products under the brand name "Wynn's." Plaintiff's advertises its products nationwide. (Doc. 5 at 3; Doc. 6 at 1).

2.    Defendant, a competitor of Plaintiff, also manufactures and sells automotive care products. Defendant does not sell its products in retail stores, but, instead, sells its products through a network of distributors. Defendant distributes its products worldwide. (Doc. 50 at 3; Doc. 51 at 1).

3.    Defendant's distributors are professionals in the automotive industry. (Doc. 51 at 2).

4.    Defendant's customers are experienced automotive industry professionals, including automotive shops, dealerships, and technicians. (Doc. 50 at 3; Doc. 51 at 1-2).

5.    Defendant routinely tests its own products and those of its competitors in its research and development laboratory. (Doc. 50 at 4; Doc. 51 at 1-2; Doc. 52 at 2).

6.    Defendant compares the test results of its own products with the results from the testing of competitors' products. Defendant then shares that analysis with its distributors. (Doc. 50 at 4; Doc. 51 at 2).

7.    Defendant has tested Plaintiff's Wynn's-branded products for a number of years. (Doc. 50 at 4; Doc. 51 at 2).

8.    In July 2016, Defendant tested several of Plaintiff's Wynn's-branded products, including Wynn's Automatic Transmission Treatment, Wynn's Power Steering Fluid and

Conditioner, Wynn's Automatic Transmission Cleaner, Wynn's Shudderguard, Wynn's

Oil System Cleaner and Conditioner, and Wynn's Diesel Charge. (Doc. 50 at 4; Doc. 51 at

2; Doc. 52 at 3-14).

9.   Tests performed by Defendant on Plaintiff's Wynn's-branded products include the

following:

a.   Fourier Transform Infrared Spectroscopy ("FTIR") Analysis;[2]

b.   Inductively Coupled Plasma ("ICP") Metals Analysis;[3]

c.   Viscosity Analysis;[4]

d.   Brookfield Viscometry Analysis;[5] and

e.   Pressure Differential Scanning Calorimetry ("PDSC") Analysis.[6]

(Doc. 52 at 2).

10.   Defendant's marketing team subsequently created the Brochure based on the lab report

---

[2] "FTIR scans provide information about the chemical composition of fluids tested, in the form of trace spectra. The shape, size and location of the spectral peaks are indicative of types and amounts of different molecules in the samples." (Doc. 52 at 2).

[3] "ICP testing detects the presence of metals, and how much of each is present in the sample. Different metals (and compounds) have different, recognized purposes in fluid formulas." (Doc. 52 at 2).

[4] "These tests, which can be conducted at various temperature 'indices,' measure fluid flow properties and project the effectiveness of lubricating oil." (Doc. 52 at 2).

[5] "This test also measures the viscosity of various materials. Typically, this testing is performed at low temperatures, usually in the range of -10 to -40 °C." (Doc. 52 at 2; *see also* Doc. 53 Ex. 1 at 3).

[6] "This test gauges the oxidation stability or useful life of an oil." (Doc. 52 at 2; *see also* Doc. 7 at 3).  With regard to this test, the American Society for Testing and Materials ("ASTM") "states that 'no correlation has been established between the results of the [PDSC] test method and service performance.'" (Doc. 7 at 3; Doc. 7 Ex. 3 at 4; Doc. 53 Ex. 1 at 3).

generated by Defendant's lab technicians following the July 2016 testing of Plaintiff's Wynn's-branded products. (Doc. 50 at 5; Doc. 51 at 2).

11. The Brochure, titled a "Competitive Analysis," compares Plaintiff's products and Defendant's products side by side.

12. The Brochure contains the following six statements, to which Plaintiff takes exception:

a. "Wynn's Automatic Transmission Treatment is nothing more than a standard Dexron®III/Mercon® ATF." (Doc. 5 at 4; Doc. 6 Ex. 1 at 1).

b. "It's likely that Wynn's Power Steering Fluid & Conditioner would break down and result in deposit formation and power steering system wear before the next service interval." (Doc. 5 at 4; Doc. 6 Ex. 1 at 5).

c. "The dispersant in Wynn's Automatic Transmission Cleaner is present in such a low concentration that, after dilution inside a transmission, minimal or no cleaning would be done." (Doc. 5 at 4; Doc. 6 Ex. 2 at 1).

d. "The presence of zinc in Wynn's Shudderguard™ will accelerate oxidation of the ATF over time, which is the #1 reason for transmission failure." (Doc. 5 at 4; Doc. 6 Ex. 2 at 5).

e. "Wynn's Oil System Cleaner & Conditioner does not contain the proper chemistry to dissolve and remove sludge and varnish or to provide a sufficient cleaning." (Doc. 5 at 4; Doc. 6 Ex. 2 at 7).

f. "Wynn's Diesel Charge is essentially a relabeled gasoline supplement. It's not advisable to put a gasoline supplement into a diesel fuel tank, just like it's not advisable to put gas into a diesel fuel tank." (Doc. 5 at 4; Doc. 6 Ex. 2 at 9).

13.    The Brochure also contains other statements about Plaintiff's products to which Plaintiff has not objected.

14.    The Dexron® III industry standard for automatic transmission fluid requires a minimum additive content of 8.3%. However, the standard sets no upper limit on the amount of additive content. (Doc. 52 at 5; Doc. 52 Exs. 8, 9).

15.    Automatic transmission fluids with different formulations may still qualify as Dexron® III transmission fluids. (Doc. 52 at 5; Doc. 52 Exs. 8, 9).

16.    Plaintiff's Wynn's Automatic Transmission Treatment is 24.9% additive blend, which contains "protective chemistry" including seal swell agents. (Doc. 7 at 2).

17.    Automatic transmission fluids often contain seal swell agents as a basic additive. (Doc. 52 at 5).

18.    Results from the FTIR spectroscopy analysis performed by Defendant on the 2016 version of Wynn's Automatic Transmission Treatment were similar, but not identical, to the results obtained from spectroscopy analysis of Wynn's Automatic Transmission Treatment in 2003 and 2006. (Doc. 52 at 3; Doc. 52 Ex. 3 at 5; Doc. 52 Ex. 4 at 2).

19.    Results from the FTIR spectroscopy analysis performed by Defendant on the 2016 version of Wynn's Automatic Transmission Treatment were similar, but not identical, to the results obtained from spectroscopy analysis of a reference sample of Shell Donax Dexron® III automatic transmission fluid. (Doc. 52 at 3; Doc. 52 Ex. 6 at 5).

20.    The ICP metals test results of Wynn's Automatic Transmission Treatment were similar, but not identical, to the ICP metals test results of the 2004 Shell Donax Dexron® III automatic transmission fluid. (Doc. 52 at 4; Doc. 52 Ex. 6 at 4).

21.     Defendant also performed a PDSC test on Wynn's Automatic Transmission Treatment. The results indicate that when Wynn's Automatic Transmission Treatment was added to the Dexron®VI automatic transmission fluid Defendant used as a baseline, the base reference life of fifty-two minutes decreased to approximately thirty-six minutes. (Doc. 52 at 4; Docs. 52 Ex. 3 at 3).

22.     A PDSC test that Defendant performed on Wynn's Power Steering Fluid & Conditioner showed that the product resisted oxidation for only 3 minutes. A PDSC test that Defendant performed on its own comparable product, BG Power Clean Red, showed that Defendant's product resisted oxidation for 41 minutes. (Doc. 52 at 6; Doc. 52 Ex. 2 at 7).

23.     Defendant also conducted Brookfield Viscometry Analyses on Plaintiff's Wynn's Power Steering Fluid & Conditioner and Defendant's BG Power Clean Red. Results indicated that Plaintiff's product did not perform as well as Defendant's product at negative forty degrees Fahrenheit. (Doc. 52 at 6; Doc. 52 Ex. 2 at 7).

24.     Wynn's Automatic Transmission Cleaner is composed of eighteen percent dispersant[7] additive and, additionally, contains a naphthenic base oil selected by Plaintiff for its solubility. (Doc. 7 at 3; Doc. 53 Ex. 1 at 4).

25.     Standard transmission fluids contain 2% to 6% dispersants. (Doc. 52 at 8; Doc. 52 Ex. 10 at 5; Doc. 52 Ex. 13 at 8; Doc. 53 at 4).

26.     Standard transmissions contain twelve to sixteen quarts of automatic transmission fluid.

---

[7] A dispersant additive "suspends the dislodged hydrocarbon particles in the lubricant oil until the [transmission] fluid is replaced." (Doc. 53 Ex. 1 at 4; *see also* Doc. 52 at 8 ("Dispersants . . . work primarily to prevent the agglomeration of contaminant particles that are suspended in the [transmission] fluid[] and prevent them from being deposited on the transmission's surfaces.")). In contrast, a detergent "clean[s] oily, sludge-based surface deposits in an automatic transmission." (Doc. 52 at 8).

(Doc. 52 at 7).

27. When Wynn's Automatic Transmission Cleaner is added to a transmission with twelve quarts of transmission fluid, the dispersant in Wynn's Automatic Transmission Cleaner is diluted to 0.5%. Adding the 0.5% dispersant from Wynn's Automatic Transmission Cleaner to the 2% to 6% dispersant already found in a standard transmission fluid results in a 15% to 25% boost in the amount of dispersant in the transmission fluid. (Doc. 52 at 8; Doc. 53 at 4).

28. The naphthenic base oil in Wynn's Automatic Transmission Cleaner consists of various types of hydrocarbons. (Doc. 53 at 4 n.1). Defendant concedes that the naphthenic base oil "possesses some amount of solvent character." (Doc. 52 at 8).

29. Wynn's Shudderguard Automatic Transmission Treatment is a transmission additive sold as an automatic transmission fluid conditioner and friction modifier. (Doc. 5 at 7; Doc. 7 at 3).

30. Wynn's Shudderguard contains zinc. (Doc. 52 Ex. 14 at 6; Doc. 53 at 5; Doc. 53 Ex. 1 at 4-5).

31. Zinc is susceptible to oxidative deterioration in automotive transmission fluids. (Doc. 52 at 9; Doc. 52 Ex. 10 at 7).

32. Oxidative breakdown is widely recognized as the leading cause of transmission failure. (Doc. 52 at 9-10).

33. Defendant's FTIR testing and lab analysis determined that Plaintiff's product is composed primarily of a common base oil and diesel fuel. (Doc. 52 at 11). Plaintiff states that Wynn's Oil System Cleaner & Conditioner contains diesel fuel, a base oil, a metal protection

compound, and a dispersant. (Doc. 5 at 7; Doc. 7 at 4; Doc. 53 Ex. 1 at 5).

34.  Sludge deposits contain both polar and non-polar components. (Doc. 50 at 13; Doc. 52 at 11; Doc. 53 Ex. 1 at 5)

35.  Diesel fuel contains non-polar hydrocarbons that dissolve the non-polar hydrocarbons in sludge and varnish in a vehicle's oil system. (Doc. 52 at 11; Doc. 53 at 5; Doc. 53 Ex. 1 at 5).

36.  The diesel fuel refining process removes some polar hydrocarbons (also known as aromatics). (Doc. 52 at 12; Doc. 53 at 6; Doc. 53 Ex. 1 at 5).

37.  The dispersant is used to keep dissolved sludge in suspension until the fluid is drained. (Doc. 5 at 8; 7 at 4; Doc. 52 at 11; Doc. 53 Ex. 1 at 5).

38.  Wynn's Diesel Charge contains a combustion modifier, polyether amine, and a mixture of amine-based soaps and other solvents of varying polarity. (Doc. 5 at 8; Doc. 7 at 4).

39.  Defendant's testing revealed that Wynn's Diesel Charge has nearly the same composition as Plaintiff's comparable product for gasoline engines, Wynn's Power Charge. (Doc. 50 at 14; Doc. 52 at 12-13; Doc. 52 Ex. 20 at 2-3).

40.  Gasoline engines and diesel engines are different. (Doc. 53 at 6; Doc. 53 Ex. 1 at 6).

41.  Defendant first shared the Brochure with its distributors at Defendant's annual convention in October 2016; Defendant also shared competitive analyses of other competitors' products at that time. (Doc. 50 at 5; Doc. 51 at 3).

42.  Defendant's annual convention was an invitation-only event, attended solely by Defendant's distributors. (Doc. 50 at 5; Doc. 51 at 3).

43.  Defendant made the Brochure available on its "Dashboard" website in November 2016;

the website is accessible to Defendant's distributors with login access (Doc. 50 at 5; Doc. 51 at 3).

44.     Defendant instructed its distributors that the Brochure and competitive analyses contained therein were to be used only for internal purposes, as a reference aid for discussions with customers, but were not to be printed out and left with customers. (Doc. 50 at 4; Doc. 51 at 3).

45.     The Brochure itself states, "This analysis is only to be used by BG Distributors and staff for discussion with automotive professionals." (*e.g.*, Doc. 6 Ex. 1 at 3).

46.     Plaintiff learned about Defendant's dissemination of the Brochure in November 2016. (Doc. 5 at 3; Doc. 6 at 2).

47.     In November 2016, one of Plaintiff's sales representatives was contacted by a customer, a car dealership in Alabama, who was given a copy of the Brochure at a meeting with Defendant's distributor. The customer was a customer of Plaintiff at the time he received the Brochure, but had previously purchased automotive care products from Defendant. (Doc. 46 Ex. 1 at 2-3).

## III.   <u>Conclusions of Law</u>

The Court may grant preliminary injunctive relief only if the moving party demonstrates: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent injunctive relief; (3) that the threatened injury to the movant outweighs the harm that the proposed injunction may cause the opposing party; and (4) that the proposed injunction is not adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). In the Eleventh Circuit, "a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly

establishe[s] the 'burden of persuasion' as to each of the four prerequisites." *Id.*

### A. Likelihood of Success on the Merits

As summarized above, Plaintiff asserts claims for False Advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a).[8] Under that provision,

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> >
> > (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

5 U.S.C. § 1125(a). For Plaintiff to demonstrate that it is substantially likely to succeed on its false advertising claim, Plaintiff must establish that:

> (1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be—injured as a result of the false advertising.

*Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1308 (11th Cir. 2010) (internal quotation marks

---

[8] Although Plaintiff's complaint additionally contains a claim for common law unfair competition, Plaintiff does not address the unfair competition claim in its motion for preliminary injunction. Accordingly, the undersigned will not address it here.

omitted).

1.  Falsity

The first element is 'satisfied if the challenged advertisement is literally false, or if the challenged advertisement is literally true, but misleading.'" *Osmose*, 612 F.3d at 1308 (quoting *Johnson & Johnson Vision Care, Inc. v. 1–800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir.2002)). The Court considers the full context of the statement or message in determining whether an advertisement is either literally false or true but misleading. *Id.*

Where the advertisement at issue cites testing, the advertisement is considered an "establishment" claim. *Id.* at 1309. In order to prove literal falsity of an establishment claim, the plaintiff is not required to prove the claim is false, but "only that the tests did not establish the proposition for which they were cited." *Id.*

In this case, portions of the Brochure at issue cite scientific testing in support of the challenged statements. Therefore, the challenged statements will be addressed as establishment claims where appropriate.

However, before addressing each challenged statement, the undersigned will first address two overarching arguments that Plaintiff makes with respect to most, if not all, of the challenged statements. First, the American Society for Testing and Materials states that "no correlation has been established between the results of the [PDSC] test method and service performance." (Doc. 7 Ex. 3 at 4). On the basis of that statement, Plaintiff argues that the PDSC testing does not support the proposition for which it was undertaken. However, the undersigned is persuaded by Defendant's argument, as presented at the hearing, that poor PDSC test results can be relied upon in certain circumstances. (Doc. 60 at 27-31). Defendant explained that the ASTM's statement that

there is no correlation between PDSC test results and service performance reasonably means that

positive PDSC test results do not necessarily result in positive real-world performance. (Doc. 60

at 30). However, Defendant also explained that the ASTM permits use of the PDSC test for

"research and development, quality control, and specification purposes" (Doc. 7 Ex. 3 at 4; Doc.

50 at 11 n.3; Doc. 60 at 28), which Plaintiff does not challenge. Therefore, at this early stage of

the proceedings, the undersigned finds it reasonable to conclude that poor PDSC test results may

be considered as evidence in support of the potential for poor real-world performance.

Plaintiff also consistently argues that Defendant's testing is not reliable because Defendant

did not perform real-world testing—i.e., Defendant did not test Plaintiff's products in vehicles.

The undersigned finds *Munchkin, Inc. v. Playtex Products, LLC*, No. CV 11–00503 AHM (RZx),

2011 WL 2174383, at *11-12 (C.D. Cal. Apr. 11, 2011), cited by Defendant, persuasive. The court

in that case distinguished between circumstances where an advertisement failed to indicate what

type of testing was performed and circumstances where there was "no . . . confusion between real

world testing and laboratory testing, because [the defendant] clearly indicate[d] . . . that [the

challenged statement at issue was supported by] a laboratory test." *Munchkin*, 2011 WL 2174383,

at *12.

In this case, the section preceding each of the challenged statements was titled "Lab

Analysis" and generally indicated either that lab analysis was performed or identified the specific

lab test performed. Therefore, there is little chance that the automotive professionals to whom the

Brochure was given would be confused about the type of the testing—lab or real-world—

performed. Thus, the lack of real-world testing does not weigh in favor of a finding that the

challenged statements are false or misleading.

With those arguments resolved, the undersigned will now address each challenged statement in turn.

      a. *"Wynn's Automatic Transmission Treatment is nothing more than a standard Dexron®III/Mercon® [Automatic Transmission Fluid]."*[9]

The contested statement appears at the end of a brief analysis of Wynn's Automatic Transmission Treatment in Defendant's Brochure, as follows:

> **Wynn's Automatic Transmission Treatment, PN 64506**
> Wynn's Automatic Transmission Treatment claims to 'extend automatic transmission fluid life, revitalize seals and O-rings , and help stop and prevent seal leaks.'
>
> **Lab Analysis:** Wynn's Automatic Transmission Treatment is a standard Dexron®III/Mercon® ATF. PDSC testing showed that this product actually decreased the life of the reference fluid, taking the base value from 52 minutes to 36 minutes.
>
> **Summary**
> *Wynn's Automatic Transmission Treatment is nothing more than a standard Dexron®III/Mercon® ATF.*

(Doc. 6 Ex. 1 at 1 (emphasis added to highlight the contested statement)).

Defendant contends that the statement is true and is supported by thorough testing and analysis. Defendant specifically cites the consistent results of FTIR spectroscopy analysis and PDSC testing. Plaintiff, on the other hand, challenges that Defendant's statement in the Brochure is false, because Wynn's Automatic Transmission Treatment is a transmission *treatment*, rather than a transmission fluid, that is meant to be added as a supplement to an automobile's automatic transmission fluid. Plaintiff argues that the statement at issue is disparaging, because, if true, it implies that Plaintiff's treatment adds nothing of benefit to the fluid that is already in an

---

[9] Defendant explains that "Dexron® III is an automatic transmission fluid specification that was released by [General Motors ("GM")] in 1993. GM eventually replaced it with 'Dexron®VI[]' between 2005 and 2006." (Doc. 50 at 9; *see also* Doc. 52 at 3).

automobile's transmission.

Defendant notes that its FTIR spectroscopy analysis demonstrates that Wynn's Automatic Transmission Treatment, as tested in 2016, was similar to the same product tested in both 2003 and 2006, before the standard changed from Dexron® III to Dexron® IV. Further, the FTIR results for the 2006 version of Wynn's Automatic Transmission Treatment and the current version of Wynn's Automatic Transmission Treatment were similar to the FTIR results obtained for a reference sample of Shell Donax Dexron® III automatic transmission fluid. And, Defendant's testing showed that the metal content in Wynn's Automatic Transmission Treatment is similar to the metal content in the 2004 Shell Donax Dexron® III automatic transmission fluid. Defendant also cites the results of a 2016 PDSC test showing that when Wynn's Automatic Transmission Treatment was added to the Dexron®VI automatic transmission fluid Defendant used as a baseline, the life of the transmission fluid was decreased.

Plaintiff asserts that Wynn's Automatic Transmission Treatment is 24.9% additive blend (approximately three times the amount required by the Dexron® III standard); that Defendant made its advertising claim based on certain similarities discovered during testing, disregarding the differences; and that Defendant assessed only four of the twenty-three criteria involved in evaluating a Dexron® III fluid.

However, Plaintiff did not refute Defendant's assertion that the Dexron® III standard has no maximum percentage, beyond which a substance fails to qualify as a Dexron® III transmission fluid. Moreover, although Plaintiff argues that its product formulation is a trade secret and that FTIR testing would not reveal the concentration of the chemicals used in its Wynn's Automatic Transmission Treatment product, Plaintiff did not challenge Defendant's argument, as presented

14

at the hearing, that the shape of the FTIR test results graph gives a general idea of the product's composition. (Doc. 60 at 24-25).

Overall, Plaintiff has not argued, much less demonstrated, that "the tests did not establish the proposition for which they were cited." *Osmose*, 612 F.3d at 1309. Although Plaintiff states that the testing does not support Defendant's claim, Plaintiff does not actually challenge the results showing that Wynn's Automatic Transmission Treatment product decreased the life of the reference fluid, rather than improving it. Plaintiff also does not challenge the FTIR results showing overarching similarities between its treatment product and the reference Dexron® III transmission fluid.

The undersigned notes that Plaintiff points out a purported error in the metals test performed by Defendant—a result showing that Plaintiff's product is 104% cobalt. (Doc. 53 Ex. 1 at 2). However, Defendant explained at the hearing that cobalt was added to the sample of Wynn's Automatic Transmission Treatment as an internal standard to ensure the test was accurate and that cobalt is well recognized for such use as an internal standard. (Doc. 60 at 32-33).

Moreover, Plaintiff asserts that its Wynn's Automatic Transmission Treatment contains additional protective chemistry and seal swell agents, evidenced by the differences in test results between Wynn's Automatic Transmission Treatment and the reference sample of a Dexron® III transmission fluid. (*See* Doc. 53 Ex. 1 at 2). However, Defendant notes that automatic transmission fluids with different formulations may still qualify as Dexron® III transmission fluids and that automatic transmission fluids normally contain seal swell agents. Further, Plaintiff does not explain how any differences in the test results are material to the Court's determination regarding the alleged falsity of Defendant's advertising statement.

15

On the current record demonstrating multiple similarities between the current version of Wynn's Automatic Transmission Treatment product and a reference sample of a Dexron® III transmission fluid, similarities between the current product and earlier versions of the product that were formulated prior to the change to Dexron® IV, and uncontested PDSC test results showing that the product actually decreased the life of the reference transmission fluid, Plaintiff has not persuaded the undersigned that there is a substantial likelihood that Plaintiff will succeed in proving that Defendant's interpretation of the test results is either literally false or true but misleading.

> b. *"It's likely that Wynn's Power Steering Fluid & Conditioner would break down and result in deposit formation and power steering system wear before the next service interval.*"

The next contested statement appears at the end of a brief analysis of Wynn's Power Steering Fluid & Conditioner in Defendant's Brochure, as follows:

> **Wynn's Power Steering Fluid & Conditioner, PN 57806**
> Wynn's Power Steering Fluid & Conditioner claims to 'stop hard steering when cold, condition and revitalize seals, and meet requirements of ATF based power steering fluid.'
>
> **Lab Analysis:** Analysis indicates that the antioxidant package is not effective, which would lead to deposit formation and viscosity increase.
>
> **Summary**
> *It's likely that Wynn's Power Steering Fluid & Conditioner would break down and result in deposit formation and power steering system wear before the next service interval.*

(Doc. 6 Ex. 1 at 5 (emphasis added to highlight the contested statement)).

Plaintiff asserts generally that Wynn's Power Steering Fluid & Conditioner contains chemicals specially developed for power steering systems and that Plaintiff has received no reports

that the product broke down, causing deposits and wear. As to the test results, Plaintiff does not challenge the test results themselves, but argues that PDSC tests do not correlate with service performance, that the Brookfield test measures for effectiveness in cold weather, not for product break-down, and that there is a different Wynn's product designed for consumers living in cold weather areas.

The undersigned agrees that the Brookfield test results are not relevant to whether Plaintiff's product will break down. Defendant used the Brookfield viscosity test "to measure the fluid's ability to flow at very cold temperatures"—in this case, at negative forty degrees Fahrenheit. (Doc. 52 at 6; Doc. 52 Ex. 2 at 7). Results indicated that Plaintiff's product did not perform as well as Defendant's product at cold temperatures. (Doc. 52 at 6; Doc. 52 Ex. 2 at 7). Although such results may be relevant to refuting Plaintiff's own marketing claim that Wynn's Power Steering Fluid & Conditioner "stop[s] hard steering when cold," (Doc. 6 Ex. 1 at 5; Doc. 52 Ex. 2 at 7), Plaintiff's marketing claims are not at issue in this case. At issue is Defendant's statement that "[i]t's likely that Wynn's Power Steering Fluid & Conditioner would break down and result in deposit formation and power steering system wear before the next service interval." (Doc. 6 Ex. 1 at 5). Defendant has offered no explanation tying Wynn's Power Steering Fluid & Conditioner's ability to flow at cold temperatures with the likelihood of fluid breakdown, deposit formation, and power steering system wear.

The undersigned, therefore, finds that the Brookfield test results do not establish the proposition for which they were offered in support—that Wynn's Power Steering Fluid & Conditioner would break down and result in deposit formation and power steering system wear. However, the Brookfield test was not the only test performed.

Defendant also performed a PDSC test on Wynn's Power Steering Fluid & Conditioner. Plaintiff does not appear to contest Defendant's assertion that poor oxidation means an increased likelihood of fluid breakdown, which would in turn cause deposit formation and power steering system wear. Further, the PDSC test results showed that Wynn's Power Steering Fluid & Conditioner resisted oxidation for only three minutes. A PDSC test that Defendant performed on its own comparable product, BG Power Clean Red, showed that Defendant's product resisted oxidation for forty-one minutes. (Doc. 52 at 6; Doc. 52 Ex. 2 at 7).

Defendant has presented at least some testing that supports it assertion regarding the potential for the breakdown of Wynn's Power Steering Fluid & Conditioner.[10] Under the circumstances presented on the current record, Plaintiff has not satisfied its burden to show that it is substantially likely to succeed on the merits of its claim that Defendant's statement—"[i]t's likely that Wynn's Power Steering Fluid & Conditioner would break down and result in deposit formation and power steering system wear before the next service interval"—is either false or true but misleading.

> c. *"The dispersant in Wynn's Automatic Transmission Cleaner is present in such a low concentration that, after dilution inside a transmission, minimal or no cleaning would be done."*

The full statement reads as follows:

> **Wynn's Automatic Transmission Cleaner, PN 64401**
> Wynn's Automatic Transmission Cleaner claims to "safely remove varnish deposits, prepare transmission for new fluid, and clean all internal transmission components."

---

[10] Plaintiff noted at the hearing that discovery revealed a comment made by Defendant's lab technician, who explained that Defendant does not have the instrumentation to specifically test for wear. (Doc. 50 Ex. 1 at 4; Doc. 60 at 13). The undersigned is persuaded that Defendant has presented test results supporting its conclusion that breakdown and wear is "likely"—a conclusion that is, in any event, an opinion and not an assertion of fact. *See supra* page 25.

> **Lab Analysis:** Infrared and lab analysis indicates this product to be composed of mineral oil and an insignificant amount of dispersant.
>
> **Summary**
> *The dispersant in Wynn's Automatic Transmission Cleaner is present in such a low concentration that, after dilution inside a transmission, minimal or no cleaning would be done.*

(Doc. 6 Ex. 2 at 1 (emphasis added to highlight the contested statement)).

Defendant contends that the statement at issue is true because Wynn's Automatic Transmission Cleaner does not contain a detergent[11] and the purportedly small amount of dispersant contained in Wynn's Automatic Transmission Cleaner has minimal, if any, ability to clean surface deposits. Defendant points out that, while a bottle of Wynn's Automatic Transmission Cleaner consists of eighteen percent dispersant, once added to a standard quantity of transmission fluid, the amount of dispersant from Wynn's Automatic Transmission Cleaner is diluted to 0.5%; Defendant asserts that the diluted amount is insufficient to clean an automatic transmission effectively. (Doc. 52 at 8).

Plaintiff counters that Wynn's Automatic Transmission Cleaner contains a high quality dispersant that, even as diluted, provides a 15% to 25% boost to the amount of dispersant already contained within the standard transmission fluid. Plaintiff further notes that the product's dispersants work in conjunction with a naphthenic base oil included in the product and argues that the various types of hydrocarbons in the naphthenic base oil do indeed address and clean surface deposits in the transmission, as supported by the principle that "like dissolves like"—a principle accepted by Defendant's chemist in a later portion of his declaration. (Doc. 52 at 11). And, as Plaintiff points out, Defendant provided no test results to support its proposition that a 0.5%

---

[11] At the hearing, Plaintiff contested Defendant's assertion that there was no "cleaner" present in Wynn's Automatic Transmission Cleaner. (Doc. 60 at 48).

increase in amount of dispersant, representing a 15% to 25% boost in quantity of dispersant, cannot provide sufficient dispersancy or cleaning benefit.

But Plaintiff, too, fails to provide test results supporting its position. Overall, the undersigned is presented conflicting declarations from chemists in support of each party's position on this challenged statement, with no test results to support either side. Ultimately, Plaintiff bears the burden to prove that it is substantially likely to succeed on the merits. Without more, Plaintiff has failed to do so on the current record.

> d. *"The presence of zinc in Wynn's Shudderguard™ will accelerate oxidation of the ATF over time, which is the #1 reason for transmission failure."*

The next contested statement appears at the end of the following description of Plaintiff's product:

> **Wynn's Shudderguard™, PN 55701**
> Wynn's Shudderguard™ claims to "eliminate shudder in automatic transmissions, reduce fluid related shifting problems, and condition seals and rings."
>
> **Lab Analysis:** Infrared and lab analysis indicates this product shows the presence of zinc. Zinc causes sludge formation when the fluid becomes oxidized. PDSC testing showed that Wynn's Shudderguard™ decreased the life of the fluid, whereas BG ATC® Plus improved the life of the fluid by about 12 percent.
>
> **Summary**
> *The presence of zinc in Wynn's Shudderguard™ will accelerate oxidation of the ATF over time, which is the #1 reason for transmission failure.*

(Doc. 6 Ex. 2 at 5 (emphasis added to highlight the contested statement)).

Defendant proffers that zinc is susceptible to oxidative deterioration in automotive transmission fluids and that oxidative breakdown is widely recognized as the leading cause of

transmission failure.  Plaintiff does not challenge those propositions.  Plaintiff merely argues that Defendant has no evidence that the amount of zinc in Wynn's Shudderguard™[12] is enough to cause transmission failure, that zinc can serve a positive purpose in a transmission treatment, and that Plaintiff believes it struck the right balance in the formulation of Wynn's Shudderguard™.  Those vague and unsupported arguments are insufficient to satisfy Plaintiff's burden.

Plaintiff additionally challenges Defendant's assertion that zinc is not typically found in modern automatic transmission fluids (Doc. 52 at 9), pointing to a zinc compound, known as ZDDP,[13] that is still used in some automatic transmission fluids. (Doc. 53 Ex. 1 at 4-5).  However, Defendant's assertion is not false merely because zinc is present in some automatic transmission fluids.  The statement that zinc is not "typically" found in automatic transmission fluid does not foreclose the possibility that the element may appear in "some" automatic transmission fluids on the market.  Therefore, the undersigned is not persuaded by Plaintiff's logic.

Moreover, Plaintiff does not challenge the results of the PDSC test, which revealed that the addition of Wynn's Shudderguard™ to a reference Dexron® IV fluid caused the reference life of the Dexron® IV fluid to decrease, rather than increase. (Docs. 50 AT 13; 52 at 10; 52 Ex. 14 at 3).

At this stage of the proceedings and on the current record, Plaintiff has not satisfied its burden of demonstrating that it is substantially likely to succeed on the merits of its claim that Defendant's statement is literally false or true but misleading.

---

[12] At the hearing, Plaintiff stated that when diluted, the amount of zinc in Wynn's Shudderguard™ equals seven parts per million. (Doc. 60 at 15).

[13] Zinc dialkyldithiophosphate. (Doc. 50 at 12).

   e. "*Wynn's Oil System Cleaner & Conditioner does not contain the proper chemistry to dissolve and remove sludge and varnish or to provide a sufficient cleaning.*"

The fifth contested statement appears in the following context:

> **Wynn's Oil System Cleaner & Conditioner, PN 61610**
> Wynn's Oil System Cleaner & Conditioner claims to "safely dissolve and remove sludge and varnish, improve compression and reduce oil consumption, and promote a better drain while reducing contamination of new oil."
>
> **Lab Analysis:** Infrared and lab analysis indicate this product is primarily a common base oil and diesel fuel. Common base oil cannot dissolve deposits found in an engine oil system. If it could, base oil in engine oil alone would be able to keep the oil system clean.
>
> **Summary**
> *Wynn's Oil System Cleaner & Conditioner does not contain the proper chemistry to dissolve and remove sludge and varnish or to provide a sufficient cleaning.*

(Doc. 6 Ex. 2 at 7 (emphasis added to highlight the contested statement)).

   In support of the statement's veracity, Defendant asserts that a base oil does not dissolve common surface deposits and that dispersants have only minimal effect on surface deposits. Plaintiff does not appear to contest these arguments with respect to the challenged statement at issue. Therefore, the undersigned will focus on Defendant's third argument—that diesel fuel is a solvent and may dissolve non-polar components in sludge and varnish, but because diesel fuel is stripped of its polar hydrocarbons (also known as aromatics) during the refinement process, diesel fuel "has limited ability to dissolve and remove the polar components of engine sludge and deposits, and[,] therefore[,] would only be partially effective (if at all) at removing the crankcase deposits found in today's engines." (Doc. 5 at 12).

   On that point, Plaintiff responds that not all polar hydrocarbons (aromatics) are removed

during the diesel fuel refining process and argues that Defendant's claim is not based on empirical testing but on mere speculation about the amount of polar hydrocarbons in diesel fuel. (Docs. 53 at 6; 53 Ex. 1 at 5).

The undersigned notes that this argument does not address the applicability of Defendant's FTIR testing and lab analysis, which determined that Plaintiff's product is composed primarily of a common base oil and diesel fuel. Plaintiff, in fact, admits that Wynn's Oil System Cleaner & Conditioner contains diesel fuel, a base oil, a metal protection compound, and a dispersant.

Nor does Plaintiff's argument sufficiently rebut Defendant's assertion that diesel fuel has limited ability to dissolve the polar components of engine sludge. Plaintiff merely demonstrates that some polar hydrocarbons remain after refinement. Plaintiff presents no evidence demonstrating the efficacy of the remaining polar hydrocarbons in dissolving engine sludge and deposits. For example, Plaintiff points to the declaration of its chemist, who explains that the ASTM specification allows the level of aromatics in "No. 2 Ultra Low Sulfur Diesel" fuel to be as high as 35 percent by volume. (Doc. 53 Ex. 1 at 5). But Plaintiff has not presented evidence of the level of aromatics found in the diesel fuel it uses in Wynn's Oil System Cleaner & Conditioner and has not presented evidence demonstrating the efficacy of diesel fuel to dissolve engine sludge and deposits at any level of aromatics permitted by the ASTM standard.

Plaintiff additionally argues that Defendant compared its premium product to Plaintiff's standard product. This argument does not persuade the undersigned that the challenged statement is false or misleading. The Brochure was set up such that Plaintiff's product, Wynn's Oil System Cleaner & Conditioner, was described on one page followed by a description of Defendant's product, BG EPR® Engine Performance Restoration. Neither description references the

competitor's product; instead, the reader may draw his or her own conclusions based on the statements made about each product.[14]  Moreover, the truth or falsity of the challenged statement depends not on any comparison made by Defendant, but on the chemistry of Plaintiff's product.

On the current record, Plaintiff has not demonstrated that it is substantially likely to succeed on the merits of its claim that Defendant's statement—that "Wynn's Oil System Cleaner & Conditioner does not contain the proper chemistry to dissolve and remove sludge and varnish or to provide a sufficient cleaning"—is literally false or true but misleading.

> f.  *"Wynn's Diesel Charge is essentially a relabeled gasoline supplement. It's not advisable to put a gasoline supplement into a diesel fuel tank, just like it's not advisable to put gas into a diesel fuel tank."*

The final statement at issue occurs in the following context:

> **Wynn's Diesel Charge, PN 18001**
> Wynn's Diesel Charge claims to "clean fuel injectors, intake valves and combustion chambers" in diesel engines.
>
> **Lab Analysis:** When added to a diesel fuel, Wynn's Diesel Charge's lubricity test results were lower than BG 244. An oxidation test showed that Wynn's Diesel Charge made the fuel break down quicker. Analysis showed that this product is the same as Wynn's Power Charge, which is a gasoline supplement.
>
> **Summary**
> *Wynn's Diesel Charge is essentially a relabeled gasoline supplement. It's not advisable to put a gasoline supplement into a diesel fuel tank, just like it's not advisable to put gas into a diesel fuel tank.*

(Doc. 6 Ex. 2 at 7 (emphasis added to highlight the contested statement)).

With regard to the instant contested statement, Plaintiff does not challenge the results of the tests described in the Lab Analysis, nor the portions of the Summary stating that "Wynn's

---

[14] As Defendant notes, the audience for the Brochure is composed of automotive professionals.

Diesel Charge is essentially a relabeled gasoline supplement"[15] and that "it's not advisable to put gas into a diesel fuel tank." Plaintiff's challenge appears to be to the portion of the statement indicating that "[i]t's not advisable to put a gasoline supplement into a diesel fuel tank."

As Defendant points out, that portion of the challenged statement is reasonably viewed as an opinion. Under the Lanham Act, statements of opinion are generally not actionable; although "a statement framed as an opinion [may be treated] as one of fact if it 'fairly implies a [factual] basis.'" *Duty Free Americas, Inc. v. Estee Lauder Companies, Inc.*, 797 F.3d 1248, 1277 (11th Cir. 2015) (quoting *Osmose*, 612 F.2d at 1311).

Plaintiff asserts that the statement appears in the "Lab Analysis" section of the page, demonstrating that it is offered as a statement of fact. However, the statement actually appears in a clearly delineated "Summary" section, and nothing in the Lab Analysis section discussed the advisability of putting a gasoline supplement into a diesel fuel tank.

As with the other statements, Plaintiff has not demonstrated that it is substantially likely to succeed on the merits of its claim that Defendant's statement is false or misleading.

### g. Conclusion

At this stage of the litigation, Plaintiff did not contest the results of Defendant's testing, did not sufficiently demonstrate that Defendant's testing did not establish the propositions for which the tests were cited, and did not provide sufficient evidence to show that the contested

---

[15] Although Plaintiff states that Wynn's Diesel Charge is not "essentially a relabeled gasoline supplement," (Doc. 5 at 12), Plaintiff states that Wynn's Diesel Charge can be used in both gasoline and diesel engines (Docs. 5 at 8; 7 at 4; 53 at 6; 53 Ex. 1 at 6) and does not contest Defendant's test results revealing that Wynn's Diesel Charge has nearly the same composition as Plaintiff's comparable product for gasoline engines, Wynn's Power Charge. (Docs. 50 at 14; 52 at 12-13; 52 Ex. 20 at 2-3). In fact, at the hearing, Plaintiff admitted that it sells the same product under both names. (Doc. 60 at 49).

statements in the Brochure were either literally false or true but misleading. Therefore, Plaintiff has not satisfied its burden to show that it is substantially likely to succeed on the merits of its false advertising claim.

### 2. Deception, Materiality, Injury

Even had Plaintiff demonstrated evidence that the challenged statements are either false or true but misleading, Plaintiff has failed to establish three of the four remaining elements[16] of its false advertising claim. While Plaintiff alleges that multiple distributors and customers have inquired about the Brochure, Plaintiff presents evidence of only one customer who received a copy of the Brochure—and that customer purchased Plaintiff's, rather than Defendant's, products. (Doc. 5 at 15; Doc. 46 Ex. 1 at 3). Therefore, Plaintiff has not established that the challenged statements in Defendant's Brochure deceived, or had the capacity to deceive, consumers; that any such deception had a material effect on purchasing decisions; or that Plaintiff has been, or is likely to be, injured as a result of the false advertising.

Plaintiff argues that this case is not about Plaintiff's testing, but about Defendant's ability to support the challenged statements in the Brochure. Defendant must defend against Plaintiff's allegations, but this is Plaintiff's case and Plaintiff, accordingly, bears the burden of proof. While continued litigation and the discovery process may provide Plaintiff the opportunity to obtain further evidence in support of its allegations, on the current record, Plaintiff has failed to establish that it is substantially likely to succeed on the merits of its false advertising claim. Nevertheless, due to the procedural posture of the motion requiring the undersigned to enter a report and

---

[16] Plaintiff asserts that because Plaintiff and Defendants products are marketed and sold nationwide, the "affecting interstate commerce" element is satisfied. *See Osmose*, 612 F.3d at 1308. Defendant does not contest the establishment of that element for purposes of the instant motion. (Doc. 50 at 18 n.5).

recommendation, the undersigned will evaluate the remaining prerequisite factors for preliminary injunctive relief.

**B.      Irreparable Harm**

Plaintiff contends that it will suffer irreparable harm in the absence of a preliminary injunction.  Plaintiff argues that the Brochure was developed to induce customers to switch from Plaintiff's products to Defendant's products, that Plaintiff has lost or likely will lose customers, and that Plaintiff has suffered or will suffer damage to its business and goodwill as a result of the challenged statements in the Brochure.

However, as explained above, although Plaintiff alleges that multiple distributors and customers have inquired about the Brochure, Plaintiff presents evidence of only one customer who received a copy of the Brochure—and that customer continued to purchase Plaintiff's, rather than Defendant's, products. (Doc. 5 at 15; Doc. 46 Ex. 1 at 3).

At the hearing, Plaintiff contended that the customer identified was merely one example of the multiple customers and distributors who have contacted Plaintiff about the Brochure. (Doc. 60 at 45).  But the undersigned is not persuaded that Plaintiff's identification of one customer who obtained the Brochure but continued to purchase Plaintiff's products is sufficient evidence of the likelihood of irreparable harm. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction[,]" not merely possible. (emphasis in original)).  Accordingly, the undersigned finds Plaintiff has not satisfied its burden to prove irreparable harm.

### C.    Balance of the Harms and Public Interest

The final two prerequisites for the imposition of a preliminary injunction require Plaintiff to demonstrate that the threatened injury to Plaintiff outweighs the harm that the proposed injunction may cause Defendant and that the proposed injunction is not adverse to the public interest. *Siegel*, 234 F.3d at 1176.

Plaintiff argues that the harm to Plaintiff's business, reputation, and goodwill that would occur in the absence of a preliminary injunction outweighs any harm Defendant might suffer by the imposition of a preliminary injunction that requires Defendant to halt dissemination of the Brochure and to recall copies of the Brochure already circulated to Defendant's distributors. Plaintiff asserts that the imposition of a preliminary injunction "would merely prohibit [Defendant] from advertising claims it is not lawfully permitted to make." (Doc. 17 at 20).

However, as explained above, Plaintiff has not, on the current record, satisfied its burden to demonstrate that it is substantially likely to succeed on the merits of its false advertising claim. Further, Defendant argues that the imposition of Plaintiff's proposed preliminary injunction would unlawfully restrain its First Amendment rights by "forc[ing] it to take measures to withhold speech from a professional, sophisticated audience capable of drawing its own conclusions." (Doc. 50 at 20).

Regarding the public interest factor, while Plaintiff recites that consumer deception is naturally against the public interest, the undersigned notes, as Defendant does, that the public interest is also served by the furtherance of a competitive marketplace. On the current record, Plaintiff has not satisfied its burden to show that the threatened injury to Plaintiff outweighs the harm that the proposed injunction may cause Defendant and that the proposed injunction is not

adverse to the public interest.

### D.    Bond

Rule 65 of the Federal Rules of Civil Procedure provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "The purpose of a bond is to provide security to the enjoined party in the event that the injunction was wrongly issued." *Edge Systems, LLC v. Aguila*, 2015 WL 12868177, at *14 (S.D. Fla. 2015). However, the amount of any bond is a matter within the discretion of the Court. *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs.*, LLC, 425 F.3d 964, 971 (11th Cir. 2005).

Neither party addressed the issue of bond in their written submissions. If the Court does not adopt the undersigned's recommendation to deny the motion for preliminary injunction, the undersigned recommends permitting the parties to file supplements addressing the bond issue.

## IV.    <u>Conclusion</u>

For the forgoing reasons, it is **RECOMMENDED** that Plaintiff's Motion for Preliminary Injunction (Doc. 5) be **DENIED**.


**Date:  June 22, 2017**


AMANDA ARNOLD SANSONE
United States Magistrate Judge

## **NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. *See* 28 U.S.C. § 636(b)(1).

Copies to:
Counsel of Record
District Judge